IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ANDREW AVERY,

Defendant.

CRIMINAL CASE NO.

1:14-CR-00379-MHC-JFK

## REPORT AND RECOMMENDATION

Defendant Andrew Avery is charged in a twelve count indictment with violations of 18 U.S.C. §§ 1343, wire fraud, and 1341, mail fraud, in connection with an alleged scheme to defraud the investors of New Day Atlanta Financial ("NDA") and the Magnolia Real Estate Fund ("Magnolia Fund"). [Doc. 1]. Pending before the court are Defendant's motions [Docs. 17 and 23] to suppress documents and emails obtained by Lee Marks, who was formerly Defendant's business partner and then a contract employee at NDA, and who, subsequently as part of a cooperation agreement, turned those documents over to the Government. Defendant contends that the seizure of the documents by Marks and subsequent relinquishment of the documents to the Government in response to a federal grand jury subpoena duces tecum violated his Fourth and Fifth Amendment rights, as well as "separation of powers," and that Mark's

conduct violated 18 U.S.C. §§ 2510 and 2701, as the documents were seized from email accounts, requiring suppression.  [Id.; Doc. 59].  The Government opposes the motions to suppress contending that Defendant's rights were not violated because Marks was not acting at the Government's direction when he acquired the materials and information, that the Government's subsequent review of the materials and information did not exceed Marks' private search, that the Government did not improperly use the grand jury to obtain the materials and information and that the electronic surveillance provisions do not provide for suppression of the emails.  [Doc. 62].  A limited evidentiary hearing, held solely for the purpose of determining the circumstances surrounding Mark's acquisition and relinquishment of the materials and information, was held on October 14, 2015.  [Doc. 57].

Also pending before the court are Defendant's motion [Doc. 28] to suppress statements (a deposition) made to the Securities and Exchange Commission ("SEC"), alleging violation of his Fifth and Sixth Amendment rights, motion [Doc. 29] to suppress documents produced to the SEC, alleging violation of his Fifth and Sixth Amendment rights, and motion [Doc. 30] to suppress documents produced by the Receiver for NDA, who was appointed by District Judge Batten as part of the civil SEC proceedings, to the Government, alleging violation of his Fourth and Fifth

2

Amendment rights.  The Government opposes the motions to suppress.  [Docs. 41 and 42].  As will be discussed, *infra*, finding that Defendant did not present sufficient factual allegations to warrant an evidentiary hearing on these motions, the court addresses the motions [Docs. 28, 29 and 30] to suppress based on the Government's and Defendant's arguments set forth in their briefs.

### Testimony & Documents Produced by the SEC and Receiver

As noted, Defendant contends that his Fourth, Fifth and Sixth Amendment rights were violated by the Government's receipt of his deposition testimony, taken by and during the SEC investigation, and of the business documents he produced to the SEC during that investigation, and receipt from the Receiver of NDA business documents. Defendant asserts that an evidentiary hearing is necessary for the Government to establish that his rights will not be violated by use of this information at a trial on the charges in the indictment.  [Docs. 28, 29, 30].  The Government responds, as regards the testimony taken by the SEC and documents received by the SEC, that Defendant failed to allege sufficient facts to place into question a violation of his constitutional rights, that Defendant's Sixth Amendment right to counsel had not attached at the time of the SEC investigation, that - to the extent the Fifth Amendment was applicable to his deposition testimony and the production of the documents - his failure to assert that

3

right at the time constitutes a waiver of the privilege against self-incrimination, and that his due process rights were not violated by the SEC's production of the information to prosecuting authorities. [Doc. 41]. And, with respect to the documents obtained from the Receiver, the Government asserts that Defendant lacked a reasonable expectation of privacy in the documents required to challenge the admissibility of that information at trial. [Doc. 42]. For the reasons stated *infra*, the court recommends denying Defendant's motions to suppress.

## I.      Background Facts

Defendant offers very little in the way of factual assertions in support of his motions to suppress. He contends that the indictment "arises from the operations of the company [NDA] and its affiliate companies and businesses during the time frame of April 2007 to May 2010." [Doc. 28 at 1; Doc. 29 at 1]. Defendant and Lee Marks were initially co-equal partners in the business, and, in late 2008, Defendant became the sole owner of the business operations. [Id.]. Defendant alleges that in 2010, the SEC "opened an investigation of NDA" and, in the course of the investigation, "compelled [Defendant] to appear for a deposition on March 23, 2010 by subpoenaing him to do so." [Doc. 28 at 2]. And the SEC "compelled [Defendant] as the owner and operator of NDA and its affiliated companies to produce . . . records and documents

4

related to the operations of NDA and its affiliated companies." [Doc. 29 at 2]. During this time, Defendant - and his former partner Lee Marks - were represented by Gregory Bartko who was under indictment for securities fraud in the Eastern District of North Carolina. [Doc. 28 at 2; and see United States v. Bartko, Criminal Case No. 5:09-CR-321, E.D. N.C.]. According to Defendant, in the criminal case, "which ensued from the SEC's investigation," the Government produced in discovery Defendant's SEC deposition and documents he produced to the SEC. [Doc. 28 at 2; Doc. 29 at 2].

With respect to the Receivership, Defendant only alleges that in connection with the SEC investigation, NDA "was first placed into monitorship and later into receivership" and that the Government obtained documents from the Receiver "pertaining to the operations of [NDA]." [Doc. 30 at 1-2]. Defendant states that he has no information as to how the Government obtained the documents. [Id. at 2].

The Government's response to Defendant's motions fills in the gaps left by Defendant's allegations of fact. In March 2010, the SEC opened the investigation of NDA for violation of the securities laws and issued subpoenas from March 8, 2010, to March 31, 2010, to NDA, Defendant, Lee Marks and NDA's accountant. [Doc. 41 at 2, 4]. On March 23, 2010, the SEC deposed Defendant pursuant to a subpoena, and at the beginning of the deposition, the SEC attorney advised Defendant as follows:

This is an investigation by the United States Securities and Exchange Commission In the Matter of NDA Financial, file number A-03215, to determine whether there have been violations of certain provisions of the federal securities laws.  However, the facts developed in this investigation might constitute violations of other federal or state, civil or criminal laws.

[Doc. 30, Exhibit 1 ("Deposition") at 5-6, 7-8].  Defendant was then asked if he had received and reviewed the SEC's Supplemental Information Form 1662, which was made a deposition exhibit.  Defendant responded that he had and that he had no questions about the form.  [Deposition at 6].

That form advised Defendant that he was entitled to be represented by counsel at all times and to consult with that attorney.  [Doc. 30, Exhibit 2 ("Supplement Information Form") ¶ B. 2].  The form further advised in pertinent part as follows:

2.    *Counsel*. . . .   You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's.  [If this is the case,] the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and responsibility for that choice, is yours. . . . .

5.    *Fifth Amendment and Voluntary Testimony*.  Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

6

> You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty or forfeiture.

[Id. ¶¶ B. 2 & 5].  And under the headings, Authority for Solicitation of Information and Effect of Not Supplying Information, Defendant was advised in pertinent part as follows:

> *Persons Directed to Supply Information Pursuant to Subpoena*. . . . Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have. . . . .
>
> If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so.

[Id. ¶¶ E, F].  And, finally, under the heading Principal Uses of Information, Defendant was advised that, although the principal purpose of acquiring information is for the SEC's use, "[f]acts developed may, however, constitute violations of other laws or rules" and that "[i]nformation provided may be used in Commission and other agency enforcement proceedings."  [Id. ¶ G].  And, under the heading Routine Uses of Information, Defendant was advised, "The Commission often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors.  There is a likelihood that information supplied by you will be made

7

available to such agencies where appropriate." [Id. ¶ H]. A long list of the other routine uses of information provided to the SEC is then provided. [Id.].

Defendant also acknowledged at that deposition that he was represented by Mr. Bartko, who also represented Mr. Marks, and was informed that the SEC would assume that any potential conflicts had been discussed with counsel. [Deposition at 7]. And Defendant acknowledged receiving the subpoena duces tecum for documents and that all responsive documents had been produced except for "a few emails" being withheld for review for privilege. [Id. at 8].

On May 3, 2010, the SEC filed a civil lawsuit against NDA, Defendant and Marks, and, on that date, District Judge Batten appointed an independent monitor, Mr. Gordon, for NDA and authorized the monitor to have "full and complete immediate access to the books and records of NDA." [Doc. 42 at 2, citing Civil Case No. 1:10-CV-1333, Doc. 1 & Exhibit 1 ("Order Appointing Monitor")]. Subsequently, on July 22, 2010, the District Judge appointed Mr. Gordon as Receiver for NDA and issued an order that provided in pertinent part:

> the Receiver shall have and possess all powers and rights to efficiently administer and manage [NDA], including but not limited to the exclusive right and power:

A.    to take custody, control and possession of all the funds, property, premises, leases, and other assets of or in the possession or under the direct or indirect control of [NDA], . . . with full power to . . . collect, recover, receive and take into possession all goods, chattels, rights, credits, monies, effects, lands, books and records of accounts and other papers; . . .

G.    to take any action which could be taken by the officers, directors, partners and trustees of [NDA]. . . .

[Doc. 42, Exhibit 2 ("Order Appointing Receiver")].

The criminal investigation into the operation of NDA was opened by the United States Attorney's Office ("USAO") on December 1, 2011, after which the Government obtained Defendant's SEC deposition testimony and the records produced to the SEC, as well as the records previously seized by the Receiver. [Doc. 41 at 4; Doc. 42 at 3]. On August 2, 2013, the final judgment was entered in the SEC's civil case, and on October 7, 2014, a sealed indictment charging Defendant in this case was returned by the federal grand jury. [Doc. 1; Doc. 41 at 4].

Additional facts will be set forth as necessary during discussion of Defendant's motions to suppress.

9

## II.   Discussion

### a.   SEC

Defendant contends that his deposition testimony, "compelled" by a subpoena issued by the SEC, was obtained in violation of his Fifth Amendment due process rights and his Sixth Amendment right to counsel, especially in light of the conflict of interest under which his attorney, Mr. Bartko, was operating at the time of the testimony.  Although not clearly articulated as a ground for his motion, Defendant has not alleged sufficient facts to place in issue the legitimacy of the SEC civil investigation or that disclosure of information obtained during that investigation to the USAO violated his due process rights.

As recently summarized by the Fifth Circuit Court of Appeals:

> "There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions.  Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the overlapping nature of federal civil and penal laws.  The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to vindicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums."

10

United States v. Simcho, 326 Fed. Appx. 791, 792 (5th Cir. 2009) (quoting F.D.I.C. v. Maxxam, Inc., 523 F.3d 566, 592 (5th Cir. 2008)).   In fact, with respect to the investigation and prosecution of potential violations of SEC regulations and laws, parallel civil and criminal investigations and prosecutions are not only common, but the sharing of information between agencies is authorized by statute.   See United States v. Moses, 219 Fed. Appx. 847, 849 (11th Cir. 2007) ("It is well established that the federal government may pursue civil and criminal actions either 'simultaneously or successively,' . . . and a federal statute expressly allows the SEC and the Department of Justice to share information relating to parallel investigations[.]") (citing 18 U.S.C. § 78u(d)); United States v. Stringer, III, 535 F.3d 929, 933 (9th Cir. 2008) ("Federal securities laws authorize the SEC to transmit evidence it has gathered to the USAO to facilitate a criminal investigation by the USAO.") (citing 15 U.S.C. §§ 77t(b) and 78u(d)); SEC v. Horowitz & Ullman, P.C., 1982 WL 1576, at *6 (N.D. Ga. March 4, 1982) ("the court notes that there is express statutory and regulatory authority for and a history of cooperation between the SEC and the Justice Department").

And the United States Supreme Court has recognized and approved the use of parallel civil and criminal investigations and prosecutions as necessary to protect the public interest.   See United States v. Kordel, 90 S. Ct. 763, 769 (1970).  In Kordel, the

11

Supreme Court held that, on the record before the court, the defendants did not establish "either a violation of due process or a departure from proper standards in the administration of justice" by the use of testimony taken in a civil proceeding against the defendant in the subsequent criminal prosecution. Id. The circumstances noted by the Supreme Court in Kordel which may establish a due process violation but were not present, included: "the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution." Id. at 769-70.

While these factors provide some guidance for courts considering the issue of whether a defendant's due process rights have been violated, this court agrees with the District Court in United States v. Scrushy, 366 F. Supp. 2d 1134 (N.D. Ala. 2005), that the "determining principle" for deciding whether Defendant's deposition testimony should be suppressed on due process grounds is: "'the prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding unless the defendant

demonstrates that such use would violate his constitutional rights or depart from the proper administration of criminal justice.'"  Id. at 1138 (quoting United States v. Teyibo, 877 F. Supp. 846, 855 (S.D. N.Y. 1995)) (emphasis deleted).  And the court finds that the critical evidence that Defendant must allege in order to make the necessary showing of a due process violation, that is, a departure from the proper administration of justice, is either that "the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case."  Stringer, 535 F.3d at 937 (noting that courts have "occasionally" either suppressed evidence or dismissed indictments when one of these two factors is present).[1]  Defendant has not alleged evidence raising such an inference – nor for that matter – any other evidence of bad faith by the Government.  See id. at 936 ("The Supreme Court has held that the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith.").  In fact, in this case, it is undisputed that the SEC's investigation and that of the USAO did not even overlap:  The SEC investigation began in March 2010,

_____

[1]The court has not found any decision suppressing evidence obtained in a civil investigation or proceeding or dismissing an indictment absent evidence of *either* improper motive in bringing or conducting the civil investigation or proceeding *or* affirmative misrepresentation during the course of the civil investigation or proceeding.

resulting in the filing of the civil complaint in May 2010 well before the USAO opened the criminal investigation in December 2011.  [Doc. 1; Doc. 41 at 4].  Defendant's failure in this regard forecloses his entitlement to an evidentiary hearing on this ground for relief.  See Moses, 219 Fed. Appx. at 850 (finding that the district court did not err in denying the defendant a hearing); United States v. Melvin, 2015 WL 7116737, at **16, 18 (N.D. Ga. May 27, 2015) (noting that other than speculation, the defendant failed to allege any facts entitling him to a hearing on his due process claim), adopted by 2015 WL 7077258 (N.D. Ga. November 10, 2015).[2]

Defendant's claims of violation of his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel likewise are meritless.  Defendant

---

[2]As will be discussed with respect to the remaining claims asserted by Defendant, he has likewise failed to allege facts entitling him to an evidentiary hearing. It is well settled that "'[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . .  A court need not act upon general or conclusory assertions. . . .'" United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000) (citation omitted); see also United States v. Corriette, 171 Fed. Appx. 319, 322-23 (11th Cir. 2006) (upholding denial of hearing for defendant seeking to suppress wire intercepts due to conclusory and unsupported claims in motion).  Thus, if a motion to suppress fails to allege facts that, if proved, would entitle a defendant to relief, a court is not required to hold an evidentiary hearing to reach a determination with respect to the motion.  See United States v. Horne, 198 Fed. Appx. 869-70 (11th Cir. 2006) ("A district court 'may refuse a defendant's request for a suppression hearing and motion to suppress if the defendant fails to allege facts that, if proved, would require the grant of relief.'") (citations omitted); Cooper, 203 F.3d at 1285 (citing omitted).

14

contends that he was "compelled" to testify because the SEC issued a subpoena for his

appearance.  That conclusion is simply and undisputedly undermined by the facts and

relevant case law.  As the Eleventh Circuit Court of Appeals stated:

> We begin our analysis with the familiar admonition that the Fifth
> Amendment protection against self-incrimination is not self-executing.
> Rather, as a general rule, to be protected a witness must assert that right
> specifically.  Thus, a witness's answers "are not compelled within the
> meaning of the Fifth Amendment unless the witness is required to answer
> over his valid claim of privilege." . . .  Further, "if a witness under
> compulsion to testify makes disclosures instead of claiming the privilege,
> the government has not 'compelled' him to incriminate himself."

United States v. Vangates, 287 F.3d 1315, 1320 (11th Cir. 2002) (quoting Minnesota

v. Murphy, 104 S. Ct. 1136, 1142 (1984)); and see United States v. White, 846 F.2d

678, 690-91 (11th Cir. 1988) (same).  The Government is not required to establish that

Defendant made a knowing and voluntary waiver of his Fifth Amendment rights; his

failure to assert the privilege constitutes a waiver.  See Murphy 104 S. Ct. at 1142;

Stringer, 535 F.3d at 938.

Fatal to his Fifth Amendment claim, Defendant does not allege that he was

compelled to testify over assertion of his Fifth Amendment privilege against self-

incrimination.[3]  And Defendant was advised that he had the right to assert his privilege

---

[3]Defendant also does not allege that had he asserted his Fifth Amendment
privilege he would have been penalized "'so as to foreclose a free choice to remain

15

against self-incrimination and was clearly warned regarding the potential uses of his SEC deposition testimony, including disclosure to the USAO.  Before Defendant was questioned, the SEC attorney advised:

> This is an investigation by the United States Securities and Exchange Commission In the Matter of NDA Financial, file number A-03215, to determine whether there have been violations of certain provisions of the federal securities laws.  However, the facts developed in this investigation might constitute violations of other federal or state, civil or criminal laws.

[Deposition at 5-6].   And the Supplemental Information form, that Defendant acknowledged receiving and reviewing, advised that, although the principal purpose of acquiring information is for the SEC's use, "[f]acts developed may, however, constitute violations of other laws or rules" and that "[i]nformation provided may be used in Commission and other agency enforcement proceedings."  [Supplemental Information Form ¶ G].  Defendant was also advised, "The Commission often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors.  There is a likelihood that information supplied by you will be made available to such agencies where appropriate."  [Id. ¶ H].

---

silent and compel incriminating testimony.'"  Vangates, 287 F.3d at 1320 (citation omitted).

16

The form also advised Defendant regarding his Fifth Amendment rights:

5.       *Fifth Amendment and Voluntary Testimony.*  Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty or forfeiture.

[Id. ¶ B. 5].  These admonitions provided Defendant with "ample warning that civil depositions are often used in criminal prosecutions[,]" and he was also told that "he could invoke his Fifth Amendment right against self-incrimination."[4] Moses, 219 Fed. Appx. at 850; and see Stringer, 535 F.3d at 938 (finding that SEC Form 1662 adequately advised the defendant regarding the potential uses of his testimony and of his right to assert his Fifth Amendment privilege); Melvin, 2015 WL 7116737, at *17 (same); Teyibo, 877 F. Supp. at 856-67 (same).

Defendant's claim that his Sixth Amendment right to counsel was violated is easily dealt with due to the undisputed fact that he was not facing criminal charges at

---

[4]And, although not clearly asserted, the Government is not required to establish that Defendant was given and waived his Miranda rights because he was not in custody at the time of the deposition.  See United States v. Baljit, 207 F. Supp. 2d 118, 120-21 (S.D. N.Y. 2002); Teyibo, 877 F. Supp. at 857 n.7.

17

the time of his deposition testimony (or when the NDA documents were produced to the SEC). The Sixth Amendment right to counsel "is indispensable to the fair administration of our adversary system of criminal justice." Brewer v. Williams, 97 S. Ct. 1232, 1239 (1977). And, "[w]hatever else it may mean, the right to counsel granted by the Sixth . . . Amendment[ ] means at least that a person is entitled to the help of a lawyer *at or after the time* that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Id. (citations omitted; emphasis added); and see United States v. Jackson, 292 Fed. Appx. 770, 774 (11th Cir. 2008) (same); United States v. Hidalgo, 7 F.3d 1566, 1569 (11th Cir. 1993). There is no dispute that Defendant was not indicted, that is, the initiation of judicial proceedings, until October 7, 2014 [Doc. 1], years after his SEC deposition testimony and production of documents to the SEC.

The fact that Defendant's Sixth Amendment right had not attached is fatal to his claim of ineffective assistance of counsel, even counsel with an apparent conflict of interest. See, e.g., Philmore v. McNeil, 575 F.3d 1251, 1257 (11th Cir. 2009) (the defendant "cannot establish a violation of his constitutional right to the effective assistance of counsel prior to his being charged [with a crime] because his Sixth Amendment right to counsel as to that offense had not yet attached"); United States v.

18

Montaner, 2012 WL 442985, at *6 (S.D. Fla. January 23, 2012) (the attorney's "representation ended well before the Defendant was charged is the death knell of the Defendant's Sixth Amendment claim:   the Defendant had no right to counsel recognized by the Sixth Amendment during [the attorney's] representation of him, thus any conflict of interest that may have existed during that representation did not implicate the Defendant's Sixth Amendment rights"); United States v. Coffman, 2011 WL 839565, at *5 (E.D. Ky. March 7, 2011) (finding that there is no evidence that the investigating agency prevented the defendant from retaining counsel, the court noted that "no case [was cited] in which a court found a violation of either the Fifth or Sixth Amendment because a similarly-situated individual did not have counsel during the course of a legitimate civil investigation"); Baljit, 207 F. Supp. 2d at 121 (because the defendant's proffer "occurred well before the Government initiated any formal proceedings against him[,] . . . [he] had neither a Sixth Amendment right to counsel at the time he participated in the proffer sessions nor a corollary Sixth Amendment right to conflict-free counsel").

And based on Defendant's allegation of fact in his motion to suppress the documents produced to the SEC pursuant to subpoena, he cannot assert a Fifth

19

Amendment privilege against self-incrimination.[5]  Defendant alleges that in 2010, the SEC "opened an investigation of NDA" and, in the course of the investigation, "compelled [Defendant] as the owner and operator of NDA and its affiliated companies to produce . . . records and documents related to the operations of NDA and its affiliated companies." [Doc. 29 at 2].  The Government correctly argues that, even if Defendant had a Fifth Amendment privilege against self-incrimination with respect to the production of NDA's business records, by producing those records without asserting any privilege, his Fifth Amendment rights are waived.  [Doc. 41 at 12-14].

As the Supreme Court stated in United States v. Hubbell, 120 S. Ct. 2037 (2000), it "is the settled proposition that a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of the documents was not 'compelled' within the meaning of the privilege. . . .  Because the papers had been voluntarily prepared prior to issuance of the summonses, they could not be 'said to contain compelled testimonial evidence, either of [the defendants] or anyone else.'"  Id. at 2043 (citation omitted).  Defendant states that the subpoena sought the business records of NDA and affiliated businesses; he

---

[5]The discussion *supra* addressing lack of any Fifth Amendment due process violations or violations of Defendant's Sixth Amendment right to counsel fully applies to the documents produced to the SEC.

AO 72A
(Rev.8/82)

does not allege that the documents were prepared under compulsion or that personal documents were sought or produced.  [Doc. 29].  While the contents of the records are not covered by Fifth Amendment protections, the act of production in some circumstances may be afforded such protection.  Hubbell, 120 S. Ct. at 2043 (the Supreme Court has "made it clear that the act of producing documents in response to a subpoena may have a compelled testimonial aspect" - "'the act of production' itself may implicitly communicate 'statements of fact'") (no citation provided); and see In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011, 670 F.3d 1335, 1342 (11th Cir. 2012) (noting that whether the contents of the documents are testimonial was not at issue, the court stated that "[w]hat is at issue is whether the *act of production* may have some testimonial quality sufficient to trigger Fifth Amendment protection") (emphasis in original).

In this case, Defendant acknowledges that he received the subpoena as the owner and operator of NDA for production of NDA records; therefore, he cannot assert a Fifth Amendment privilege with respect to the *act of production*.  "The law is well settled that the Fifth Amendment privilege is not available to corporations or their officers with regard to the production of corporate records." United States v. Lawhon, 288 F. Supp. 669, 670 (S.D. Fla. 1967); and see Hubbell, 120 S. Ct. at 2044 ("when

21

the custodian of documents responds to a subpoena, he may be compelled to take the witness stand and answer questions designed to determine whether he has produced everything demanded by the subpoena"); United States v. Holley, 481 F. Supp. 61, 63 (S.D. Fla. 1979) ("The law is settled that a corporation is not privileged from self-incrimination, . . . and that the custodian of corporate records must produce those records on behalf of the corporation, even if the records might incriminate the custodian."); United States v. Culver, 224 F. Supp. 419, 426 (D. Md. 1963) ("There is no Fifth Amendment privilege with respect to the production of the records of a corporation, even when they are in the custody or possession of a person under investigation.").   Accordingly, Defendant did not have the right to assert a Fifth Amendment privilege over the documents sought by the subpoena or his act of producing those documents.

And, even if he had such a privilege, as discussed *supra*, he waived the privilege by failing to assert it in response to the subpoena.  See Stringer, 535 F.3d at 938; Vangates, 287 F.3d at 1320; SEC v. Aquacell Batteries, Inc., 2008 WL 495372, at *3 (M.D. Fla. February 20, 2008) (after noting that the individual defendant could not assert a Fifth Amendment privilege with respect to the production of corporate documents, the court found that he also waived - having not objected at the time of

production - any privilege as to any non-corporate documents falling within the scope of the SEC's request). Defendant was fully apprised of his Fifth Amendment rights in the Supplemental Information form. That form specifically provided:

> *Persons Directed to Supply Information Pursuant to Subpoena*. . . . Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have. . . . .
>
> If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so.

[Supplemental Information Form ¶¶ E, F]. And, as the Government points out, Defendant apparently understood his rights [Doc. 41 at 13]; Defendant stated that certain emails were withheld from production for review by his counsel [Deposition at 8-9]. Defendant has failed to assert any grounds upon which he could have at the time of production or is able to now facing criminal prosecution rely upon his Fifth Amendment right against self-incrimination.

For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 28 and 29] to suppress his SEC deposition testimony and records produced to the SEC be **DENIED**.

23

### b.      Receiver

Providing very few facts upon which to base his motion to suppress, Defendant asserts that the Government must establish that receipt of NDA's records from the court appointed receiver did not violate his Fourth or Fifth Amendment rights.  [Doc. 30].  Defendant acknowledges that after the SEC filed the civil law suit, NDA "was first placed into monitorship and later into receivership" and that the Government obtained documents from the Receiver "pertaining to the operations of [NDA]."  [Doc. 30 at 1-2].  Initially, the court has addressed the fact that Defendant lacks any Fifth Amendment privilege against self-incrimination with respect to NDA's and its affiliate businesses' records.  With respect to this production of documents, Defendant could not even rely upon an assertion of the privilege with respect to the act of production because the Receiver not Defendant was the producer of the records.  Second, as the Government argues, at the time of production of the documents - after the Receiver was appointed and took over control of NDA and all of its records and assets, Defendant lacked a reasonable expectation of privacy to challenge any search for or seizure of the records.  He cannot assert a violation of his Fourth Amendment rights. [Doc. 42].

24

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search, that is, the premises from which records of NDA were seized as well as the NDA records, at the time of any search or seizure of those documents.  See Cooper, 203 F.3d at 1283-84.  Making this determination involves a two-part inquiry: (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves,

25

169 F.3d 687, 690 (11th Cir. 1999) (citation omitted).  In other words, "Fourth Amendment rights are personal and may not be vicariously asserted."  Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995).

The undisputed facts establish that Defendant did not have a reasonable expectation of privacy in NDA or its records at any time after the Receiver was appointed on July 22, 2010.  On May 3, 2010, the SEC filed a civil lawsuit against NDA, Defendant and Marks, and, on that date, District Judge Batten appointed an independent monitor, Mr. Gordon, for NDA and authorized the monitor to have "full and complete immediate access to the books and records of NDA."  [Doc. 42 at 2, citing Civil Case No. 1:10-CV-1333, Doc. 1 & Order Appointing Monitor]. Subsequently, on July 22, 2010, the District Judge appointed Mr. Gordon as Receiver for NDA and issued an order that provided, in pertinent part:

> the Receiver shall have and possess all powers and rights to efficiently administer and manage [NDA], including but not limited to the exclusive right and power:
>
> A.       to take custody, control and possession of all the funds, property, premises, leases, and other assets of or in the possession or under the direct or indirect control of [NDA], . . . with full power to . . . collect, recover, receive and take into possession all goods, chattels, rights, credits, monies, effects, lands, books and records of accounts and other papers; . . .

26

G.      to take any action which could be taken by the officers, directors, partners and trustees of [NDA]. . . .

[Doc. 42, Order Appointing Receiver].  The Receiver, accordingly, was authorized *exclusively* to access and exert control over all of the assets and records of NDA and to take any action which could have been taken by Defendant with respect to those assets and records - including allowing, that is, consenting to, any search of NDA and/or seizure of NDA records.  The Receiver was authorized to cooperate with law enforcement authorities and produce upon request any and all NDA records.  The Government asserts that records were produced by the Receiver after the criminal investigation opened in December 2011.  [Doc. 42 at 3].  Nothing before the court refutes that assertion.

In United States v. Gray, 751 F.2d 733 (5th Cir. 1985), the Fifth Circuit Court of Appeals rejected a Fourth Amendment claim asserted under circumstances similar to those before the court herein.  A state court had ordered the defendant's business in to receivership, and the receiver discovered a document which the defendant admitted to the receiver contained false statements.  Id. at 735.  When a federal agent later met with the receiver, advising that the defendant was under investigation, the receiver agreed to cooperate and turned over the document.  Id.  The court rejected the

AO 72A
(Rev.8/82)

defendant's argument that a search warrant was required for the agent to seize the document and that his Fourth Amendment rights were violated.  Id. at 737.  The court found that, at the time the document was seized, the defendant "no longer had custody or control over his companies' records, that authority having passed to the receiver. Because [he] no longer had a reasonable expectation that those records would remain private, he lack[ed] standing to challenge the 'seizure.'"  Id. (the court further stated that the agent "did not 'seize' the records, but made a request that [the receiver] agreed to" and "obtained the [document] through the consent of its lawful custodian . . . and thus did not violate the Fourth Amendment").  In United States v. Setser, 568 F.3d 482 (5th Cir. 2009), the court affirmed the holding in Gray.  Id. at 490-91.  The court stated that "[o]nce the receiver took possession of the property, Setser's possessory rights were lost" and "Setser could neither exclude others from the seized property nor take precautions to maintain privacy of the property."  Id. at 491.  "After appointment, the receiver was 'vested with complete jurisdiction and control' of the property and had the 'right to take possession' of it. . . .  The receiver was required to 'manage and operate the property . . . in the same manner' as its original owner. . . .  The receiver became the possessor, and as such could consent to the search of the seized documents."  Id.  (quoting 28 U.S.C. §§ 754 and 959).

AO 72A
(Rev.8/82)

Likewise, in this case, after the District Judge appointed Mr. Gordon as Receiver of NDA, Defendant lost any possessory rights in the business.  Mr. Gordon, not Defendant, had the authority to allow any search of NDA or seizure of NDA records or to consent to the production of requested documents.  Defendant simply did not have a reasonable expectation of privacy upon which to base a Fourth Amendment challenge to the documents produced by the Receiver to the Government.  And see United States v. Stanford, 805 F.3d 557, 568 (5th Cir. 2015) ("a receiver in proper possession of property may turn it over to law enforcement without a warrant"); United States v. Madison, 226 Fed. Appx. 535, 541-42 (6th Cir. 2007) (finding that the receiver, who by court order had exclusive authority and control over all assets, property, books and records of the business, had authority to consent to a search of the business by law enforcement authorities).

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 30] to suppress documents produced by the Receiver be **DENIED**.

## III.   Conclusion

For the foregoing reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 28, 29 and 30] to suppress be **DENIED**.

29

## Motions to Suppress Evidence Obtained by Lee Marks

Defendant initially filed a motion [Doc. 17] to suppress, along with a perfected motion [Doc. 23] to suppress, contending that the Government's use of materials and information pertaining to NDA and from Defendant's personal Gmail account obtained by Lee Marks violates his Fourth Amendment right against unreasonable searches and seizures.[6]  Defendant asserted that his privacy interests were invaded by Marks' conduct and that turning over the materials and information, at the Government's request, to the Government - even if Marks was not acting at the Government's direction when the materials and information were initially seized - constituted an illegal seizure of the materials and documents by the Government.  Defendant further contended that Marks' actions in accessing Defendant's personal email account, without authorization, violated 18 U.S.C. §§ 2510 and 2701 requiring suppression of those emails.  [Docs. 17 and 23].  The Government filed a pre-hearing brief in opposition to the motions asserting that, at the time of the seizure, Marks was not

---

[6]Quite frankly, to the extent that the materials and information obtained by Marks and turned over to the Government as part of his cooperation agreement as discussed *infra* duplicates the materials and information obtained through the SEC civil investigation or from the Receiver, Defendant's motions are moot if the District Court adopts the recommendation on Defendant's motions [Docs. 28, 29 and 30] to suppress.

30

acting at the Government's direction and was acting for his own interest, therefore, seizure of the materials and information did not violate the Fourth Amendment.[7]  And the Government responded that the electronic surveillance statutes cited by Defendant do not provide for suppression of electronic communications, such as the emails from Defendant's personal account.  [Doc. 26].  Defendant's reply did not add to his arguments.  [Doc. 33].  Solely for the purpose of establishing the circumstances surrounding Marks' acquisition and subsequent relinquishment of the materials and documents at issue, the court held an evidentiary hearing.  [Doc. 57].[8]

Following the hearing, in his brief, Defendant appears to have abandoned his arguments that Marks acted at the direction of the Government in seizing the documents and materials and that Marks' action of relinquishing the materials and documents constituted a separate invasion of his privacy interests; instead, Defendant now contends that the Government's subsequent examination of the documents exceeded the scope of the private search and, therefore, constituted a violation of his

---

[7]Marks apparently continued to receive copies of Defendant's emails after he began cooperating with the Government; however, the Government will not use any of the emails obtained by Marks after the date he began cooperating with the Government.  [Doc. 26 at 3; Doc. 62 at 11 n.2].

[8]Citations to the evidentiary hearing transcript are: (Tr. at ).

Fourth Amendment rights.  [Doc. 59 at 9-14].  And, for the first time, Defendant contends that his Fifth Amendment right not to incriminate himself and "separation of powers" were violated by the Government's use of a grand jury subpoena to obtain the materials and information in Marks' possession.  [Id. at 14-21].  And, relegated to a short footnote, Defendant again asserts that the emails obtained from his personal Gmail account should be suppressed for violation of § 2701.  [Id. at 8 n.4].  In response, the Government argues that Marks' action in seizing and turning over the materials and information to the Government did not establish a violation of Defendant's Fourth Amendment rights and that the scope of the subsequent examination of those materials and documents did not exceed Marks' private search. The Government also argues that use of the grand jury subpoena to obtain the materials and documents did not violate Defendant's Fifth Amendment right or "separation of powers."  [Doc. 62].

After consideration of the briefs, record before the court and pertinent legal authority, the court recommends that Defendant's motions be denied.

## I.   Background Facts

At the evidentiary hearing, Lee Marks testified regarding his association with Defendant Avery and NDA as part of his cooperation agreement with the Government.

(Tr. at 4-5; Gov't Exh. 1).   With respect to NDA, Defendant and Marks, whose

background is in information technology ("IT"), were co-founders and 50/50 partners

until October 2008.  (Tr. at 6, 21).  At that time, Marks sold his interest to Defendant

and became a contract employee for NDA.  (Tr. at 6, 21-22).  Marks handled IT work

and office administration and, as such, had access to NDA documents, both electronic

and hard copy.  (Tr. at 6-7, 22).  At NDA, if possible, every document was digitized

and stored electronically on an office server, and Marks had access to the electronic

documents, along with Defendant and the office manager, Ken Millican.[9]  (Tr. at 7).

Each person also had a laptop computer with documents store locally on those laptops.

(Tr. at 7).  In September 2009 and prior to contact with the SEC, Marks backed-up

locally stored emails and NDA documents to the office server as a precaution against

loss.  (Tr. at 7-8, 24).  Marks recalled that Defendant maintained some important files

on his desk top computer in a folder and that he also copied that folder, which would

have included any saved emails, to the server.[10]  (Tr. at 24-25).

---

[9]A small number of documents, although digitized and scanned onto the server, were also maintained in hard copy, such as real estate titles.  (Tr. at 7, 23).

[10]Only if Defendant maintained personal files or emails mixed in with business files would this copying of documents have captured Defendant's personal files.  (Tr. at 24-26).   The emails copied would not have included emails sent through Defendant's Gmail account.  (Tr. at 26).

AO 72A
(Rev.8/82)

After the SEC made contact and while under monitorship, in May 2010, Marks made a copy of the entire office server onto his laptop[11] for his personal use.  He stated, "I felt like it was important to have the company documents in case I needed to defend myself in a case, if didn't have access to the server files. . . .  I just felt like I needed to have a copy of the files, the business files, so that I could refer to them in the future."[12]  (Tr. at 8-9, 23-24).  No government agent or authority directed Marks to make the copy of the office server.  (Tr. at 9-10).

Through his attorney, probably in August 2014, Marks began communicating with the Government and entered a cooperation agreement that included immunity. (Tr. at 11, 27-28; Gov't Exh. 2).  Once he did so, on September 17, 2014, he met with and talked to the Government, including the federal prosecutor.  (Tr. at 11-12, 26-27). Marks advised the Government about his knowledge of NDA and advised that he had obtained NDA documents, that is, a copy of the office server.  (Tr. at 12).  He was

---

[11]This was the laptop that he used at NDA; a few years later, he transferred the information to a new laptop.  The NDA documents remained stored on the new laptop until a few months before the evidentiary hearing when he transferred the documents to an external hard drive.  (Tr. at 10).  When Marks transferred the documents to the Government, they were being stored on the new laptop.  (Tr. at 11).

[12]Marks did not copy any additional information from the NDA server after May 2010.  (Tr. at 36).

AO 72A
(Rev.8/82)

subpoenaed to appear before a federal grand jury and to turn over the documents obtained from the NDA server.  (Tr. at 12-13, 41-42; Gov't Exhs. 3 and 4).  Marks thereafter produced the documents to the Government by copying the documents onto a SD card (two flash drives) and delivering that card to his attorney who transferred the SD card to the Government on September 26, 2014.[13]  (Tr. at 13-16, 17, 42-43; Gov't Exh. 5).  However, prior to producing the SD card, Marks also created an index file which provided a brief explanation of each folder into which he had placed the NDA documents.  (Tr. at 16; Gov't Exh. 6).

The documents turned over to the Government, as Marks explained, "were very organized" to begin with, and "then the civil case" began, and "he had gone in and just for [his] own purposes organized things, although [he] didn't change the server copy because [he] wanted it to be an exact copy . . . . So but [he] had previously organized things in a very specific way just for the civil case."  (Tr. at 28).  With respect to the documents already in Marks' possession, in order to clarify some of the information contained therein at the request of the Federal Bureau of Investigation ("FBI") agent on September 17, 2014, Marks placed certain documents - out of the tens of thousands

---

[13]Marks did not appear before the grand jury.  (Tr. at 42).

of documents - in one folder that related to the agent's question.[14]  (Tr. at 14-15, 29).

The Government did not ask Marks for additional documents that were not already in

his possession.  (Tr. at 15).  And with respect to a document that Marks had created for

the SEC civil case, an analysis of certain prospectuses, the AUSA requested

clarification.  (Tr. at 15).  On the index created by Marks, one folder is labeled,

"Additional materials prepared for ASASU[,]" that is, United States Attorney's Office,

and one folder is labeled, "Items requested, 9-17-14."  (Tr. at 16-18).  Marks'

recollection of the files within the folder "Additional materials for ASASU[,]" is either

that the Government asked for those documents to be put in a folder or that, before he

met with the Government, he placed the files in the folder because he felt the files were

important.[15]  (Tr. at 30-31, Def's Exh. 1).  The files in the folder, "Items Requested 9-

17-14[,]" were placed there after the meeting due to specific questions asked about

---

[14]Marks explained that the agent "asked for some clarification on some transactions . . . that would involve [him] putting specific files in folders and saying here's the file that corresponds to that transaction."  (Tr. at 29).

[15]Marks clarified that statement later in cross-examination when he denied preparing the folder in anticipation of cooperating with the Government because, after reviewing the index, he thought some of the files contained therein would be of no interest to the Government, indicating that he would not have on his own included those files in the folder but that the Government must have asked about the files.  (Tr. at 39-40).

AO 72A
(Rev.8/82)

various transactions; Marks did not create any of these files, instead he categorized documents.[16]  (Tr. at 32, 34, Def's Exh. 2).  All of the documents in these folders were already in Marks' possession, and he simply placed documents into the folders.  (Tr. at 16-18).  Marks did not "actually read all" of the documents in the files turned over to the Government.[17]  (Tr. at 44).

In addition to the records of NDA, Marks also acquired emails from Defendant's personal Gmail account beginning sometime in 2010.  (Tr. at 18, 26).  After NDA was closed and Defendant stopped contacting anyone associated with NDA, Marks became concerned that Defendant was hiding or had left the country.  (Tr. at 19).  Marks accessed the account, without Defendant's authorization, by using a password that Marks knew Defendant had used in the past.  (Tr. at 19).  Once he accessed the account, Marks altered a setting so that a copy of each email received by Defendant was then forwarded to an email address that Marks could access.  He wanted to be able to track Defendant's whereabouts due to his fear that Defendant would not be present

---

[16]The Government agreed that "the government asked for Mr. Marks to highlight certain documents and he chose to do so by creating isolated folders."  (Tr. at 38).

[17]However, Marks, when asked about specific folders and the contents of those folders, was able to describe in detail the files contained in the folders.  (Tr. at 32-33, 35-36, 39-40).

if a case was brought against NDA.  (Tr. at 20, 26).  Marks advised the Government that he had done so and those emails were provided to the Government pursuant to the grand jury subpoena.[18]  (Tr. at 20-21).  Prior to September 17, 2014, the Government was not aware that Marks had accessed Defendant's email account, and he had not been instructed by the Government to do so.  (Tr. at 21).

Additional facts will be set forth as necessary during discussion of Defendant's motions to suppress.

## II.    Discussion

### a.    Search by Private Party & Defendant's Fourth Amendment Rights

As noted, although previously contending that Marks' action of turning over the materials and information to the Government in September 2014 constituted a search and seizure in violation of his Fourth Amendment rights [Docs. 17 and 23], Defendant in his post-hearing brief argues instead that the Government's subsequent search of the materials and information, including asking Marks to identify certain files or documents contained therein, exceeded the scope of Marks' private search such that

---

[18]These emails are included in the folder labeled, "Andy Current Location."  (Tr. at 33-34).

Defendant's Fourth Amendment right to privacy was violated [Doc. 59 at 9-15]. Defendant's arguments in support of this contention are not persuasive.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Runyan, 275 F.3d 449, 456-57 (5th Cir. 2001) (quoting U.S. Const. amend. IV). However, "[t]he Fourth Amendment proscribes only governmental action - it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official." Id. at 457 (quoting United States v. Jacobsen, 104 S. Ct. 1652, 1656 (1984)) (internal quotation marks omitted); and see United States v. Meister, 596 Fed. Appx. 790, 792 (11th Cir. 2015) (same); United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003) (Because the Fourth Amendment "does not provide protection against searches by private individuals acting in a private capacity[,] . . . evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.") (citation and internal quotation marks omitted); United States v. Bomengo, 580 F.2d 173, 175 (5th Cir. 1978) ("The Fourth Amendment

proscribes only governmental action.  A search by a private individual for purely private reasons does not raise Fourth Amendment implications.").[19]

In this case, the undisputed facts establish that at the time, in May 2010, when Marks copied the NDA office server onto his personal laptop, he was not acting at the Government's direction and was acting for his personal benefit.  He stated, "I felt like it was important to have the company documents in case I needed to defend myself in a case, if I didn't have access to the server files. . . .  I just felt like I needed to have a copy of the files, the business files, so that I could refer to them in the future." (Tr. at 8-9, 23-24).  No government agent or authority directed Marks to make the copy of the office server.  (Tr. at 9-10).  And, when he decided to access Defendant's personal Gmail account in order to have a copy of each email forwarded to him and while receiving those emails up to the date of his cooperation with the Government, he likewise was acting on and for his personal interest.[20]  After NDA was closed and Defendant stopped contacting anyone associated with NDA, Marks became concerned

---

[19]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[20]As noted, the Government is not going to use any emails received after Marks began cooperating with the Government.  [Doc. 26 at 3; Doc. 62 at 11 n.2].

40

that Defendant was hiding or had left the country.  (Tr. at 19).  Once he accessed the account, Marks altered the Gmail account setting so that a copy of each email received by Defendant was then forwarded to an email address that Marks could access.  He wanted to be able to track Defendant's whereabouts due to his fear that Defendant would not be present if a case was brought against NDA.  (Tr. at 20, 26).  As such, the Defendant's Fourth Amendment right's are not impacted by Marks' seizure and search of the NDA office server and of Defendant's personal email account.  See United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003) ("For a private person to be considered an agent of the government, [the court looks] to two critical factors:  (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends."); United States v. Kinney, 953 F.2d 863, 865 (4th Cir. 1992) (more than the mere presence of a law enforcement officer is necessary to constitute government action because private actor must be deemed to have acted as "instrument" of the government).

Once the contents of the NDA office server and Defendant's personal emails were examined by Marks, any expectation of privacy possessed by Defendant in those materials and documents was destroyed.  See United States v. Grimes, 244 F.3d 375,

41

383 (5th Cir. 2001) (after a private search, a person no longer possesses a reasonable expectation of privacy within the scope of the private search); Kinney, 953 F.2d at 866 (within the scope of the private search, a defendant's expectation of privacy is destroyed); Bomengo, 580 F.2d at 176 (to the extent of a private invasion of a defendant's expectation of privacy, that expectation of privacy is lost).  Therefore, Defendant no longer had a reasonable expectation of privacy in the contents of the NDA officer server copied by Marks or the personal emails forwarded to Marks, and the subsequent delivery of these materials and documents to the Government and the Government's search of the SD card containing these materials and documents does not change this fact nor constitute a separate search implicating the Fourth Amendment.

In Bomengo, the former Fifth Circuit Court of Appeals stated:

We have long recognized that a police view subsequent to a search conducted by private citizens does not constitute a "search" within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search.

580 F.2d at 175.  In Jacobsen, the Supreme Court stated the test as follows:  "The additional invasions of [a defendant's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search."  104 S. Ct. at

AO 72A
(Rev.8/82)

1657, 1658-59 ("Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information . . . .  The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated.").

Defendant contends that the Government exceeded the scope of Marks' private search by requesting that Marks identify various documents or files within the copied NDA office server or by answering questions about those documents or files which Marks accomplished by creating folders and placing various files and documents within those folders.  [Doc. 59 at 13-14]; (Tr. at 13-15).  And Defendant points to the fact that Marks stated that he did not actually read each of the documents copied from the NDA office server.  [Doc. 59 at 8]; (Tr. at 20).  In support of his argument that this search by the Government exceeded the scope of the private search, Defendant relies on the Supreme Court decision in <u>Walter v. United States</u>, 100 S. Ct. 2395 (1980).  [Doc. 11-12].  However, the court agrees with the Government that the facts in <u>Walter</u> are inapposite to those before this court and that any subsequent search of the materials and documents produced by Marks did not invade a legitimate privacy interest remaining in those materials or documents.  [Doc. 62 at 10-15].

43

First, the court finds that it was not necessary for Marks to have actually read each item contained on and copied from the NDA office server in order to justify the Government examining all of the documents.  And the Government's request that Marks explain certain documents or provide clarification about the materials and documents, which caused him to reorganize the files within various folders or to place various files or documents into a new folder, does not result in a finding that doing so exceeded the scope of Marks' private search.  Marks' testimony at the evidentiary hearing establishes that he was intimately familiar with the materials and documents copied from the NDA office server.  Marks was initially part owner of the business and then worked as an independent contractor handling IT matters and as office administrator with full access to the materials and information relating to the operations of NDA.  (Tr. at 4, 6-8).  And after he copied the NDA office server to his laptop, although the files "were very organized" to begin with, "then the civil case" began, and "he had gone in and just for [his] own purposes organized things . . . .  So but [he] had previously organized things in a very specific way just for the civil case." (Tr. at 8-9, 28).  The very fact that Marks was able to find and organize files, including creating an index file for the folders on the SD card, in order to respond to the Government's inquiries about the documents and various transactions, also supports

44

the conclusion that he was familiar with all of the materials turned over to the Government.  (Tr. at 12-16).  Marks evidenced his familiarity by easily identifying the contents of files when asked about them on cross-examination at the hearing.  (Tr. at 32-33, 35-36, 39-40).  And, as the Government points out, the circumstances of Marks' receipt of a copy of the emails from Defendant's Gmail account, that is, as an effort to keep track of Defendant's whereabouts, results in the conclusion that Marks was reviewing those emails as he received them.  (Tr. at 18-20).

The court finds that under these circumstances, once the contents of the NDA office server and the copied personal emails, all placed on the SD card - a container, were subjected to Marks' private search, any privacy interest Defendant held as to the contents of that container was destroyed.  As held by the Fifth Circuit Court of Appeals in Runyan, citing the Eleventh Circuit Court of Appeals' decision in United States v. Simpson, 904 F.2d 607 (11th Cir. 1990):

> We agree with the Eleventh Circuit's position in Simpson that the police do not exceed the scope of a prior private search when they examine the same materials that were examined by the private searchers, but they examine these materials more thoroughly than did the private parties. . . . In the context of a closed container search, this means that the police do not exceed the private search when they examine more items within a closed container than did the private searchers. . . .  Thus, the police do not engage in a new "search" for Fourth Amendment purposes each time they examine particular items found within the container.

45

Runyan, 275 F.3d at 464-65 (citing Simpson, 904 F.2d at 610).  And see United States v. Garcia-Bercovich, 582 F.3d 1234, 1238 (11ᵗʰ Cir. 2009) (finding that thirteen boxes, "located on the same shrink-wrapped pallet, and . . . covered by the same shipping manifest[,]" were "'all one package[,]'" such that, after one of the boxes was opened by the private party, "the other boxes could also be searched as part of that same 'package'") (citation not provided).  And the Supreme Court decision in Walter does not provide support for Defendant's argument.

In Walter, "12 large, securely sealed packages containing 871 boxes of 8-millimeter film depicting homosexual activities were shipped by private carrier" and mistakenly delivered to the wrong company.[21]  100 S. Ct. at 2399.  Employees of that company "opened each of the packages, finding individual boxes of film[,]" and they examined the exterior of the boxes which depicted suggestive drawings and explicit descriptions.  Id.  One or two of the boxes were opened with an unsuccessful attempt to view portions of the film by eye.  Id.  After the 12 packages were turned over to the

---

[21]Significant to the Court's analysis was the fact that the search involved a shipment of securely sealed packages, which cannot be opened without a warrant, and that the contents involved "books or other materials arguably protected by the First Amendment . . . when the basis for the seizure is disapproval of the message contained therein," making it "especially important that [the warrant] requirement be scrupulously observed."  Id. at 2401.

government, agents viewed the films with a projector.[22] Id.  The Supreme Court held that, although the government was lawfully in possession of the entire shipment, "[t]he projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefor must be characterized as a separate search." Id. at 2402.  The Court noted that, although "some circumstances - for example, if the results of the private search are in plain view when the materials are turned over to the Government - may justify the Government's re-examination of the materials," such was not the case before the Court.  Id.

Such is the case before this court.  The Government's examination of the SD card in this case, first, did not involve examining sealed containers that had not been opened and examined by Marks.  As noted, based both on his initial ownership interest in NDA and then his employment with NDA, he was familiar with the materials and information turned over to the Government.  Second, after obtaining a copy of the NDA server, Marks organized and arranged the materials and information for his personal use.  He added the emails received from Defendant's account to that SD card. (Tr. at 4, 6-9, 18-20).  Under these circumstances, the court simply does not find that

_____

[22]Based on a reading of the Court's decision, the undersigned concludes that the agents' examination extended to all 871 boxes of film.

47

the Government's examination of the SD card or seeking explanation from Marks about the contents of the SD card involved opening separate sealed containers not previously opened by Marks but only involved potentially a more thorough search of a container (or containers) already opened and examined by Marks.  Defendant maintained no reasonable expectation of privacy in the contents of the SD card, that is, the copy of the NDA office server and his Gmail emails, all of which were unsealed by the time that Marks agreed to cooperate with the Government and allowed the Government to examine the contents of that SD card.

The court finds that Defendant's Fourth Amendment right to privacy and to be free from an unreasonable search and seizure were not violated by the Government's receipt of the SD card from Marks or the subsequent examination of the SD card's contents.

**b.** **Grand Jury Subpoena**

After the initial meeting with Marks on September 17, 2014, the Government served a subpoena duces tecum on him for his testimony before a federal grand jury and for production of the SD card.[23]  (Tr. at 12-13; Gov't Exhs. 3, 4).  Marks produced

---

[23]The grand jury subpoena does not request the SD card *per se* but sets forth a description of the materials and information to be produced (Gov't Exh. 3); however, the evidence presented at the hearing indicates that the subpoena sought the contents

the SD card to his attorney who delivered it to the Assistant U.S. Attorney on September 26, 2014. (Tr. at 15-17, 42, 44; Gov't Exh. 6). Marks did not appear before the federal grand jury. (Tr. at 42). The federal grand jury returned the instant indictment against Defendant on October 7, 2014. [Doc. 1]. Defendant appears to challenge this utilization of the federal grand jury, based on a lot of speculation but little factual basis, on several grounds. First, he states that the Government cannot use a grand jury to obtain materials for its own purposes, such as for discovery to obtain materials for presentation at trial. [Doc. 59 at 14]. He also states that a subpoena cannot be used to invade a legitimate privacy interest but that the subpoena must be reasonable, be based on an individualized suspicion of wrongdoing by Defendant and not constitute a fishing expedition. [Id. at 15-18]. He contends that the use of the grand jury subpoena by the federal prosecutor without any apparent involvement by the grand jury was improper violating his Fourth and Fifth Amendment rights and separation of powers and that the court should conduct an *in camera* review of grand jury records to be sure that the materials and information produced by Marks were presented to the grand jury. [Id. at 16-17]. And Defendant asserts that use of the grand jury subpoena to obtain NDA records violated his Fifth Amendment right against self-

---

of the SD card (Tr. at 13-17).

49

incrimination.  [Id. at 21].  The court agrees with the Government [Doc. 15-18] that Defendant's arguments are not persuasive.

"Traditionally the grand jury has been accorded wide latitude to inquire into violation of criminal law. . . .  The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials."  United States v. Calandra, 94 S. Ct. 613, 617 (1974).  Accordingly, "the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' . . .  The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred."  United States v. R. Enterprises, Inc., 111 S. Ct. 722, 726 (1991) (citation omitted); and see In re Grand Jury Proceedings (Billy J. Williams, GJ88-1), 995 F.2d 1013, 1016 (11th Cir. 1993) ("a federal grand jury enjoys sweeping powers to investigate allegations of criminal behavior[,]" and "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed") (citations and internal quotation marks omitted).  Therefore, "the Government cannot be required to justify the issuance of a

grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." R. Enterprises, Inc., 111 S. Ct. at 726.

This being said, "[t]he investigatory powers of the grand jury are nevertheless not unlimited. . . .  Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." Id. at 727; and see United States v. US Infrastructure, Inc., 576 F.3d 1195, 1214 (11th Cir. 2009) ("A defendant claiming grand jury abuse 'has the burden of showing that the Government's use of the grand jury was improperly motivated.'") (citation omitted).  Accordingly, the Fourth Amendment imposes a reasonableness requirement to protect privacy interests on subpoenas seeking production of information and materials to the grand jury.[24]  R. Enterprises, Inc., 111 S. Ct. at 727 (citing Fed. R. Cr. P. 17(c)); and see Calandra, 94 S. Ct. at 619 ("A grand jury's

---

[24]However, "the Fourth Amendment exclusionary rule does not apply to grand jury proceedings." Id. at 726 (citing Calandra, 94 S. Ct. at 622-23 ("a witness has no right of privacy before the grand jury[,]" and grand jury inquiries based on evidence allegedly obtained in violation of the Fourth Amendment's protection against unreasonable search and seizure do not constitute new Fourth Amendment violations). And see In re Grand Jury Proceedings (No. 93-2) John Roe, Inc., 142 F.3d 1416, 1425 (11th Cir. 1998) (the grand "may consider incompetent evidence, . . . as well as evidence obtained in violation of the Fourth Amendment").

subpoena duces tecum will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment.") (citation omitted). Reasonableness depends on context, and "[i]n the grand jury context, the decision as to what offense will be charged is routinely not made until after the grand jury has concluded its investigation.  One simply cannot know in advance whether information sought during the investigation will be relevant and admissible in a prosecution for a particular offense."  R. Enterprises, Inc., 111 S. Ct. at 727.  For this reason, "the subpoena recipient is likely to find it exceedingly difficult to persuade a court that 'compliance would be unreasonable.'"  Id. ("the challenging party's 'unenviable task is to seek to persuade the court that the subpoena that has been served on [him or her] could not possibly serve any investigative purpose that the grand jury could legitimately be pursuing'") (citation omitted).  Because "the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority[,]" . . . a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance."  Id. at 728 ("a subpoena . . . challenged on relevancy grounds . . . must be denied unless the district court determines that there is no

reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation").

Contrary to Defendant's apparent belief, a federal prosecutor is authorized to act on behalf of a federal grand jury and obtain and issue grand jury subpoenas without prior knowledge of the grand jury so long as "the grand jury [is not] used 'solely or even primarily' to gather evidence against an *indicted* defendant . . . ." US Infrastructure, Inc., 576 F.3d at 1214 (citation omitted; emphasis added); and see United States v. Alred, 144 F.3d 1405, 1413 (11th Cir. 1998) (if a subpoena might assist the grand jury investigation, "the subpoena should issue, even though the prosecutor possibly will use the information procured for a purpose other than obtaining evidence for the particular grand jury investigation[,]" so long as it is not used "for discovery concerning a pending prosecution"). "[U]nder Federal Rule of Criminal Procedure 17(a), the clerk of a district court is authorized to issue blank subpoenas (marked with the seal of the court) to a prosecutor working with a grand jury." Coronado v. BankAtlantic Bancorp, Inc., 222 F.3d 1315, 1320 (11th Cir. 2000). "The U.S. Attorney's powers in connection with a grand jury investigation are substantial.  He [or she] may propose witnesses to be subpoenaed, have subpoenas issued in blank by the court served without consulting the grand jury, and generally

53

direct the investigation." United States v. O'Kane, 439 F. Supp. 211, 214-15 (S.D. Fla. 1977) (however, a federal prosecutor is not a "proper substitute for the grand jury" and a grand jury subpoena may not be used "as a compulsory administrative process of the United States Attorney's office" such that a directive for a witness to provide identification evidence, for example, handwriting exemplars, must be issued by the grand jury) (citations omitted).  And see United States v. Vosburgh, 166 F.3d 344, at *2 (9th Cir. 1998) (unpublished) (rejecting the defendant's allegation of grand jury abuse based on the prosecutor's issuance of subpoenas without the grand jury's authorization, stating "prosecutors can issue subpoenas commanding witnesses to appear before the grand jury without the grand jury's knowledge or authorization"); Alred, 144 F.3d at 1413 n.7 (Finding no misuse of the grand jury, the appellate court adopted the district court's reasoning, "[There is] the presumption that the government is acting in good faith, and . . . it's the defendant's burden to prove the reason and abuse . . .[;] in the absence of clear evidence to the contrary, [the court] presume[s] the prosecutor acted properly in issuing the subpoena."); United States v. Smith, 687 F.2d 147, 149-50 (6th Cir. 1982) (recognizing "that grand juries 'are for all practical purposes an investigative and prosecutorial arm of the executive branch of government[,]' . . . the authority of the United States Attorney in connection with

54

grand jury investigations extends to 'select[ing] the witnesses to be subpoenaed to appear before the grand jury and generally direct[ing] the investigation[,]'" and he or she "'may obtain subpoenas issued in blank by the court, fill in the blanks, and have the witnesses served without consulting the grand jury'") (citations omitted).

Based on this legal authority, the court finds that Defendant has not carried his burden of establishing that the subpoena issued to Marks was improper or that the prosecutor's conduct constituted an abuse of the grand jury process.  She was authorized, on behalf of the grand jury, to obtain a subpoena duces tecum and issue it to Marks, even if the grand jury was not aware that she had issued the subpoena.  The subpoena was issued in September 2014, with a return date in September.  The information and materials being sought were delivered to the prosecutor in September before the indictment against Defendant was returned in October 2014.  (Tr. at 12-13, 15-17, 42, 44; Gov't Exhs. 3, 4, 6) [Doc. 1].  There is no indication, much less proof, that the subpoena to Marks was issued for an improper purpose, that the prosecutor abused the grand jury's investigatory powers or that the information and materials were not properly returned to the grand jury before the indictment was returned.  The court declines Defendant's invitation to examine the grand jury's records under these

circumstances.  The subpoena to Marks was "issued through normal channels" and is therefore "presumed to be reasonable."  R. Enterprises, Inc., 111 S. Ct. at 728.

Defendant likewise has not established that the terms of the subpoena duces tecum were unreasonable under the Fourth Amendment.  To begin with, it is doubtful that Defendant even has standing to assert this argument.  He was not the recipient of the subpoena.  See Id. ("the burden of showing unreasonableness must be *on the recipient* who seeks to avoid compliance") (emphasis added).  And, as already determined, by the time the grand jury subpoena was issued, Defendant lacked any privacy interest in the materials and information in Marks' possession.  Most importantly, Defendant simply has not established that the scope of the subpoena duces tecum was unreasonable.  Defendant and his business, NDA, had been the subject of an SEC investigation and resulting civil litigation[25] which established grounds for the grand jury to investigate his conduct and that of NDA.  The materials and information in Marks' possession, which was sought by the subpoena, pertained to operation of NDA and to Defendant's whereabouts after the SEC began its civil investigation.  (Tr. at 7-9, 12-16, 18-21; Gov't Exh. 3).  These facts amply satisfy the test for

_____

[25]Details regarding the SEC investigation and lawsuit are set forth earlier in this report and recommendation.

reasonableness in the context of a grand jury investigation.  See R. Enterprises, Inc., 111 S. Ct. at 726; Alred, 144 F.3d at 1413; In re Grand Jury Proceedings, 995 F.2d at 1015-16.

Defendant also contends that the issuance of the subpoena duces tecum violated his Fifth Amendment right against self-incrimination, that is, his privilege as to the act of production of the documents.  [Doc. 59 at 19-21].  With respect to the NDA records possessed by Marks and turned over to the federal grand jury, citing In re Grand Jury Subpoena v. Kent, 646 F.2d 963 (5th Cir. Unit B 1981), Defendant contends "that the testimonial privilege of the Fifth Amendment extends to employees of a sole proprietor with respect to records and documents which the employee has been granted access to through the employee's work for the sole proprietor where the sole proprietor has retained constructive possession of the records and documents."  [Id. at 19].[26]

---

[26]The court notes this is the first time that Defendant makes the assertion that NDA, along with its affiliated companies, constituted a sole proprietorship.  Although Defendant had previously asserted that after 2008, he solely owned NDA [Docs. 28 and 29], there is no evidence in the record as to the nature of the business except for the court orders entered placing NDA into monitorship and receivership.  [Doc. 42, Exhs. 1 and 2].  And Defendant did not challenge the Government's previous assertion that NDA was a corporate entity for which no Fifth Amendment privilege existed.  [Doc. 41 at 13].  However, for the purposes of resolving this issue, the court will assume that NDA constituted a sole proprietorship.

In Kent, the court found that Kent Oil was a sole proprietorship, employing ten persons in two offices, and that Kent was the custodian of the company's records and that one employee, Allen, was the comptroller.  Both Kent and Allen were subpoenaed to produce company records.  646 F.2d at 964-65.  Seeking to quash both subpoenas, Kent alleged that "he was the exclusive owner of the subpoenaed documents . . . ."  Id. at 965.  Allen stated that because she "was not an employee at the time, [she] played no role in the preparation, filing or maintenance of any documents [at issue,]" that, "[a]lthough [she] now h[as] access to the documents [at issue], as do the other employees of the Company, [she has] never exercised nor [has she] had any reason to exercise any exclusive control of such documents to the exclusion of any other employee[,]" and that "Mr. Kent has not relinquished his possession and control over the Company's records to any employee . . . ."  Id. at 966.  Citing to Couch v. United States, 93 S. Ct. 611 (1973), the court noted, in determining whether a Fifth Amendment right to object to production of documents applied, that the Supreme Court had distinguished between situations where "the accused had given up all possession" with those "'where constructive possession is so clear or the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact.'"  Kent, 646 F.2d at 969 (quoting

58

Couch, 93 S. Ct. at 618).   Finding that Kent never relinquished control over the subpoenaed records to Allen, that she had mere access, and that compliance with the subpoena would require her in response thereto to take illegal possession of the documents, the court quashed the subpoena.  Id.  The facts in Kent are inapposite to those before this court.

As already determined, Defendant simply retains no possessory interest in the copy of the NDA records acquired by Marks in 2010 - an action not taken in response to any governmental involvement - more than four years before the grand jury subpoena was issued.  (Tr. at 8-10).  Marks did not merely have temporary access to the NDA records, he had been in sole possession of the copy of the records for years. Absolutely nothing about Marks' production of the NDA records triggered Defendant's privilege as to the act of production of the records on the SD card.  This conclusion is especially true in light of the fact, by the time the subpoena issued, that control over NDA and its records and assets had been placed into receivership and out of Defendant's possession and control.

In re Grand Jury Subpoena: John Doe, No. 05GJ1318, 584 F.3d 175 (4th Cir. 2007), the Fourth Circuit Court of Appeals explained that "the so-called Couch exception (that is, the notion that a person may invoke his personal Fifth Amendment

act of production privilege to bar third persons from producing documents) [is applied] in a *very limited manner* - only to those situations where the person from whom production is sought has such an attenuated possessory right in the documents that the person claiming the privilege retains exclusive constructive possession of them." <u>Id.</u> at 186 (emphasis added) (distinguishing <u>Kent</u> in which "the employee had neither prepared, filed, nor maintained any of the requested documents, and . . . she merely had access to them").  Defendant simply did not have exclusive right to possession of the NDA documents in September 2014.   Marks, instead, had prepared, filed and maintained NDA documents while co-owner and then a contract employee (Tr. at 4, 6-8), as well as had taken possession of the copy of the NDA documents subsequently subpoenaed by the Government.  The <u>Couch</u> exception does not apply in this case.

Finally, citing to the decision in <u>In re Grand Jury Subpoenas Served February 27, 1984</u>, 599 F. Supp. 1006 (E.D. Wash. 1984), Defendant contends, with respect to the emails obtained by Marks from Defendant's private Gmail account, that he retains a privacy privilege under the Fifth Amendment based on the personal nature of the emails.   [Doc. 59 at 20-21].   As discussed, after the SEC investigation began, Defendant apparently fled and Marks was afraid of being left to alone answer allegations regarding NDA operations.  (Tr. at 18-19).  In order to be able to track

60

Defendant's whereabouts, without Defendant's knowledge, Marks accessed Defendant's private Gmail account and changed account settings so that he would receive a forwarded copy of each email Defendant had received. (Tr. at 19-20). Those emails were included in the information produced in response to the grand jury subpoena. (Tr. at 20-21). Defendant's argument seeking suppression of these emails is not persuasive.

In In re Grand Jury Subpoenas Served February 27, 1984, after discussing the fact that the holding in Boyd v. United States, 6 S. Ct. 524 (1886), providing for a Fifth Amendment privilege based on the content of private documents, had been subsequently undermined by the Supreme Court in Fisher v. United States, 96 S. Ct. 1569 (1986), Doe v. United States, 104 S. Ct. 1237 (1984), and the Ninth Circuit's interpretation of those decisions, the court found "one could reasonably conclude that in this circuit the *contents* of an individual's personal papers are not privileged . . . ." 599 F. Supp. at 1011 (emphasis in original). The court nevertheless stated "that in some instances privacy is still a factor and 'there are certain documents no person ought to be compelled to produce at the Government's request.'" Id. (citation omitted). The district court decision, which is of doubtful authority even within the Ninth Circuit Court of Appeals, see In re Grand Jury Proceedings On February 4,

1982, 759 F.2d 1418 (9th Cir. 1985), is not persuasive and is contrary to binding legal

authority in this circuit.[27]

In Fagan v. United States, 545 F.2d 1005 (5th Cir. 1977), the former Fifth Circuit

Court of Appeals rejected a suppression argument based on the content of the materials

obtained by the Government.  The court stated:

> In Andresen v. Maryland, [96 S. Ct. 2737 (1976)], and Fisher[ ], the
> Supreme Court has made it clear that the fifth amendment protection of
> "personal security, personal liberty, and private property," Boyd, [6 S. Ct.
> at 532], does not amount to a general privilege for private papers.  Rather,
> those cases establish that the privilege can be invoked only when the
> actual preparation of the documents or the making of the written
> declarations which they contain, has been compelled.  When a document
> has been created voluntarily as Fagan's private papers had been[,] the
> fifth amendment does not bar its use in a prosecution providing the
> document has been obtained . . . pursuant to a valid subpoena.

---

[27]In In re Grand Jury Proceedings On February 4, 1982, the appellate court
found immaterial to its decision whether the lower court's ruling was based on a
finding that the records at issue were personal business records or sole proprietorship
records "because the Supreme Court has now made it clear that regardless of the
precise characterization of the disputed papers, the contents of such documents are not
privileged under the fifth amendment in the absence of some showing that creation of
the documents was the product of compulsion."  759 F.2d at 1419.  And those courts
that have found that such a privacy right might remain nonetheless note "that Boyd,
at best, must be read in a very limited fashion.  If the contents of private papers are
protected at all . . . it is only in rare situations, where compelled disclosure would break
the heart of our sense of privacy."  In re Steinberg, 837 F.2d 527, 530 (1st Cir. 1988)
(citation and internal quotation marks omitted).  Besides summarily asserting that the
contents of the emails from his private Gmail account "are very personal" [Doc. 59 at
21], Defendant fails to make any showing that would satisfy this rigorous standard.

AO 72A
(Rev.8/82)

Id. at 1007.  And see In re Keller Financial Services of Florida, Inc., 259 B.R. 391, 402 (M.D. Fla. 2000) ("'the Fifth Amendment does not protect the contents of voluntarily prepared documents, either business or personal'") (citation omitted); In re Grand Jury Proceedings, 73 F.R.D. 647, 651 (M.D. Fla. 1977) ("The law is now settled that the Fifth Amendment does not preclude the acquisitions and use of non testimonial, documentary evidence in the form of a person's private papers that were voluntarily created.").  Defendant makes no argument that the emails in question were created under compulsion, and the record refutes such a finding.  Defendant's Fifth Amendment argument on this basis fails.

### c.    Electronic Surveillance

Although only asserted in a footnote in his post-hearing brief [Doc. 59 at 8 n.4], Defendant initially argued that Marks' conduct in acquiring a copy of his personal emails violated the Wiretap Act, 18 U.S.C. § 2510, and the Stored Communications Act, 18 U.S.C. § 2701, requiring suppression of the emails pursuant to 18 U.S.C. §§ 2515 and 2708.  [Doc. 23 at 4-6].  The Government responded that the emails in question, constituting electronic communications and not wire or oral communications

63

covered by the Wiretap Act, are not subject to suppression under § 2515.[28]  [Doc. 26 at 8-9, citing Steiger, 318 F.3d at 1050, 1052].  The Government is correct.  In Steiger, the Eleventh Circuit Court of Appeals noted that, although the Electronic Communications Privacy Act ("ECPA") "amended numerous sections of the Wiretap Act to include 'electronic communications,' the ECPA did not amend § 2515." 318 F.3d at 1050.  And "[t]he omission of 'electronic communications' from section 2515 is dispositive.  The Wiretap Act does not provide a suppression remedy for electronic communications unlawfully acquired under the Act."  Id. at 1052; and see United States v. Cray, 450 Fed. Appx. 923, 930 (11th Cir. 2012) (citing Steiger for the holding

---

[28]In Steiger, the court adopted a narrow reading of the Wiretap Act such that "very few seizures of electronic communications from computers will constitute 'interceptions.'"  318 F.3d at 1050.  "[T]here is only a narrow window during which an E-mail interception may occur-the seconds or mili-seconds before which a newly composed message is saved to any temporary location following a send command.  Therefore, unless some type of automatic routing software is used (for example, a duplicate of all of an employee's messages are automatically sent to the employee's boss), interception of E-mail within the prohibition of [the Wiretap Act] is virtually impossible."  Id. (citation and internal quotation marks omitted).  Such is not the case here.  Marks "set up a forwarding e-mail so that the e-mail that came in [to Defendant's Gmail account] would be forwarded to an e-mail address that [Marks] had access to."  (Tr. at 20).  Marks did not obtain a copy of the email until after it was delivered to Defendant, becoming an electronic communication, when it was then forwarded to him.

64

"that the Wiretap Act did not provide a statutory suppression remedy for unlawfully acquired electronic communications").

And the ECPA does not otherwise provide for suppression of unlawfully accessed electronic communications. See United States v. Beckett, 369 Fed. Appx. 52, 55-56 (11th Cir. 2010) ("The ECPA does not statutorily provide for suppression of evidence obtained as a result of violations of the Act. . . .  The ECPA authorizes an aggrieved party to file a civil action for the 'knowing or intentional' violation of the Act.") (quoting 18 U.S.C. § 2707(a)).  And § 2708, which provides that "'[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for non-constitutional violations of this chapter[,]'" Id. at 56 (quoting 18 U.S.C. § 2708), does not aid Defendant in suppressing the emails.  As discussed *supra*, Marks' private acquisition of the emails did not constitute a Fourth Amendment violation such that Defendant can assert a constitutional challenge.

Accordingly, there are no grounds for suppression of the emails obtained from Defendant's private Gmail account pursuant to the ECPA.

65

**III.    Conclusion**

For these reasons, court recommends that Defendant's motions [Docs. 17 and 23] to suppress the information and materials the Government obtained from Marks be **DENIED**.

## Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions to suppress [Docs. 17, 23, 28, 29 and 30] be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 5th day of February, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

66